**AFFIRMED and Opinion Filed May 6, 2022**



**In the**

**Court of Appeals**

**Fifth District of Texas at Dallas**

**No. 05-20-00438-CV**

**PAVECON HOLDING CO. INC., PAVECON LTD. CO., AND PAVECON PUBLIC WORKS, LP, Appellant**

**V.**

**MARTY MURPHY, Appellee**

**On Appeal from the 192nd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-17-10592**

## MEMORANDUM OPINION

Before Justices Myers, Partida-Kipness, and Carlyle
Opinion by Justice Carlyle

After a jury trial, the trial court entered judgment in favor of Marty Murphy on his breach of contract claim against Pavecon Holding Co. Inc., Pavecon Ltd. Co., and Pavecon Public Works, LP (collectively, "Pavecon"[1]). Pavecon appeals, and we affirm in this memorandum opinion. *See* TEX. R. APP. P. 47.4.

Marty Murphy began working for Pavecon and its predecessor entities in 2012, under an employment agreement he negotiated with C. David Walker—the

---

[1] For convenience and ease of understanding, we refer to the appellants collectively as Pavecon throughout this opinion, even if a particular action may have been attributable to only one of the appellants, unless the distinction is relevant to our analysis.

chief executive officer and controlling shareholder of Pavecon Holding. The agreement, which provided that Mr. Murphy would be a "Division President," stated that in addition to his salary, Mr. Murphy would receive a year-end bonus of eight percent of "Pavecon's DFW Division's" pre-tax net profit and two percent of the pre-tax profit for "all Divisions . . . divided by the number of operating Divisions." Mr. Murphy would also receive a "**Stock Equity Bonus**" consisting of "Pavecon stock awarded annually based on 10% Equity in Dallas/Fort Worth Division." The agreement further provided that, if Pavecon started a "Public Works Division in DFW, Pavecon stock will be awarded annually based on 25% Equity in the new Division." Mr. Walker signed the agreement as "President, Pavecon, Ltd.," and he confirmed in a separate email that "[n]ot stated in the agreement" was a promise that Mr. Murphy would also receive a yearly cash bonus of ten percent of the pre-tax net profit for the "Public Works Division."

With respect to the stock-equity bonuses, Mr. Walker testified he explained to Mr. Murphy that Pavecon would take the agreed equity percentages, multiply them by the profits of the respective divisions, give Mr. Murphy a portion of those amounts in cash to cover taxes, and use the remaining portion to purchase shares of Pavecon Holding stock, with the number of shares dependent on how much could be purchased at the stock's year-end book value.

Working under this arrangement, Mr. Murphy succeeded in expanding the Pavecon business, and Pavecon started its Public Works Division shortly after his

hire. That division grew rapidly, to the point where it eventually became necessary to bring someone in to help ease the burden on Mr. Murphy, who was being spread thin running both the DFW and Public Works divisions. To that end, Pavecon hired Dean Dumke in February 2015 to run the Public Works Division. To facilitate Mr. Dumke's hire, Mr. Murphy agreed to reduce his cash and stock-equity bonuses in the Public Works Division each by five percent. Thus, as of early 2015, it is undisputed that the parties modified Mr. Murphy's employment agreement to reflect a reduction in his cash and stock-equity bonuses in the Public Works Division.

Around that time, in early 2015, Mr. Walker restructured the Pavecon organization, primarily because he was concerned about his stock position being diluted by the various stock-equity bonuses granted to Pavecon's division presidents. He decided to transition the organization to a model where division presidents would be given partnership or membership interests in newly formed Pavecon entities, with "profit sharing" taking the place of stock bonuses.

According to Mr. Walker, "everybody's percentages were the same. It was just moving from a corporation where we issued stock to a partnership bonus share -- bonus sharing plan basically. But the same percentages, nothing changed." Mr. Walker testified that division presidents were told at a March 2015 meeting that Pavecon was "going to do away with Pavecon Holding Company as a vehicle that owned the company and we were going to move to a partnership. We were going to buy back your shares. Actually, we had to offer to buy back those shares," but

"everybody understood that we were closing out of the -- stock business and out of Pavecon Holding." He reiterated, however, that "everybody's percentage remained the same." Going forward, Pavecon would calculate equity bonuses, distribute a portion of those bonuses in cash to cover taxes, and keep track of the remaining balances in capital accounts maintained by the reorganized entities for each division president. Mr. Walker explained that this was "a better deal for everybody," because "you didn't have to worry about another division losing money, dragging down your value. What you got was what -- was yours in your account."

At that March 2015 meeting, Pavecon presented division presidents with binders containing various agreements related to the reorganization. Mr. Murphy's binder included: (1) a Limited Liability Company Agreement of Pavecon Ltd. Co.; (2) a Second Amended and Restated Agreement of Limited Partnership of Pavecon Public Works LP; (3) a First Amended and Restated Profit/Loss Sharing Agreement of Pavecon Ltd. Co.; (4) a Profit/Loss Sharing Agreement of Pavecon Public Works LP; and (5) a Stock Purchase Agreement (SPA).

When asked whether Pavecon told its division presidents, including Mr. Murphy, that they had to sign the agreements, Mr. Walker testified Pavecon told them "they needed to seek counsel" and that "this is where we're going." He said Pavecon "tried to lay out everything and be as fair as we could." Nevertheless, Mr. Murphy recalled that Pavecon's lawyer, Mr. Crutcher, came into the meeting, "handed everybody books," and told them, "this is the reorganization. Things really aren't

going to change. This is more about Mr. Walker's . . . depletion of percentages. . . . But it's not affecting anything else. Here's your books. Need you to review them and sign them, get them back to us."

When Mr. Murphy reviewed the reorganization agreements, he noticed Pavecon had inserted a non-compete provision that was not part of his original employment agreement. That made him uncomfortable, he said, because he had been working in the paving industry all of his adult life, it was all he knew, and it's how he fed his family. He also objected to some of the agreements' other terms, most of which he said he could not understand. According to Mr. Murphy, he told Pavecon he would not sign the agreements, and he expressed his concerns directly to Mr. Walker, who reassured him that he would "make sure that we negotiate this so it's fair for both parties."

Mr. Murphy continued working for Pavecon for several years without signing the bulk of the reorganization agreements. Although there was conflicting testimony about Pavecon's efforts to get Mr. Murphy to sign the other agreements during that period, Mr. Murphy testified that Pavecon's primary concern was obtaining his signature on the SPA. Despite operating under the new entities beginning in January 2015, Pavecon could not complete the planned reorganization without buying back the stock held by its minority shareholders. And the SPA was the vehicle through which Pavecon proposed to acquire Mr. Murphy's shares, which he had accumulated through his stock-equity bonuses.

According to Mr. Murphy, Mr. Walker told him that "he needed to at least sign" the SPA. When Mr. Murphy again raised his concerns about the agreements, Mr. Walker told him, "I don't know enough to explain it to you." He recommended that Mr. Murphy speak with Pavecon's chief financial officer, Don Heierman, who knew exactly what Mr. Murphy needed to sign, which Mr. Walker said "doesn't include the entire agreement. It's just specific pieces. If you'll go talk to him, he'll explain it to you. Y'all can work this out."

Mr. Murphy testified he spoke to Mr. Heierman in December 2016, and Mr. Heierman said: "I've talked to [Pavecon's lawyer] and you can sign specific pieces so that I can just buy your stock back. It doesn't have anything to do with the rest of the agreement." With respect to the SPA's release clause, Mr. Heierman told him it had "nothing to do with anything going forward. This is just for the sale of your 2295 shares in the old company."

Mr. Murphy signed the SPA in December 2016 and exchanged his 2,295 shares in Pavecon Holding stock for $298,028.70. Although Mr. Murphy never executed any of the other reorganization agreements, he continued working for Pavecon until May 2017. And during that time, both he and the company acted with the understanding that Mr. Murphy continued earning the same percentages in annual equity bonuses as he earned before the reorganization. Indeed, Pavecon continued paying Mr. Murphy the same portion of his equity bonuses in cash to cover taxes, which Mr. Murphy remitted to the IRS. And Pavecon represented, both to Mr.

Murphy and to the IRS, that he earned equity in the reorganized entities, as reported on their Form K-1 tax filings.

Mr. Murphy testified that no one at Pavecon ever told him he would not receive his equity bonuses if he did not sign the remaining reorganization agreements. And nothing at the trial contradicted that assertion. At most, Mr. Walker told Mr. Murphy he would not "legally" be a partner until he signed the agreements. But there is no dispute that Pavecon continued to allocate his bonuses to his capital accounts throughout the remainder of his employment.

This all came to a head in May 2017, when Pavecon fired Mr. Murphy after learning he had not been fully reimbursing the company for costs associated with improvements he was making to his own land using Pavecon's resources. Mr. Walker acknowledged he had known for months that Mr. Murphy was using Pavecon resources to improve his private property, although he was unaware of the scope or duration of the work. Mr. Walker also admitted that he authorized Mr. Murphy to use Pavecon's resources to make the improvements, provided that Mr. Murphy set up a Pavecon "job number" to track and reimburse Pavecon's expenses at cost.

But Mr. Murphy did not set up a Pavecon job number to track his expenses. In fact, several Pavecon employees testified that Mr. Murphy specifically instructed them to use job numbers from other Pavecon projects when submitting paperwork associated with his property. As a result, Pavecon paid multiple invoices for work

done on Mr. Murphy's property without ever receiving reimbursement. When Mr. Walker learned about that, he terminated Mr. Murphy's employment immediately.

Mr. Murphy maintained that the work done on his property was intended primarily to help Pavecon keep its hourly employees busy—thus preventing employee turnover—during lulls in Pavecon's other projects. He further asserted that any failure to reimburse the company for expenses was unintentional. According to Mr. Murphy, although he did not set up a Pavecon job number, he had his own system in place to track all of the expenses for his property, and he diligently paid those expenses. He concluded that other Pavecon employees had mistakenly approved a handful of equipment invoices without first presenting them to him for payment. When he learned about those invoices, he said, he sought to pay them immediately. Shortly after his termination, he sent Pavecon a check for $35,938.23 to cover the balance of several invoices he had discovered were mistakenly paid by Pavecon, along with a letter offering to pay any additional costs Pavecon believed he overlooked.

Pavecon neither cashed Mr. Murphy's check nor asked him to reimburse any additional costs. Instead, it withheld the balance of the equity bonuses he had been accumulating in his capital accounts since 2015—which totaled $865,522 by the end of 2016. Mr. Walker testified that his initial thinking in withholding the funds was that Pavecon wanted to be able to offset whatever balance Mr. Murphy owed for the work done on his property against the balance it owed him from his capital accounts.

It was not until after Mr. Murphy filed the underlying suit to collect his unpaid equity bonuses, in August 2017, that Pavecon changed its position, arguing instead that it owed him no equity bonuses because he never signed the remaining reorganization agreements. Pavecon also filed counterclaims against Mr. Murphy, alleging among other things that Mr. Murphy: (1) breached his fiduciary duties by misappropriating Pavecon's resources for his personal gain; and (2) breached the SPA's release provision by suing Pavecon.

At the conclusion of a nine-day trial, the jury returned a verdict finding both that Pavecon breached its contract with Mr. Murphy, causing him $1,058,018 in damages, and that Mr. Murphy breached his fiduciary duties to Pavecon Public Works LP, causing it $145,250 in damages. The trial court entered a judgment consistent with the verdict, offsetting Mr. Murphy's damages by the damages awarded to Pavecon Public Works LP, and awarding Mr. Murphy his attorney's fees. Pavecon appeals from those portions of the judgment favorable to Mr. Murphy.

MR. MURPHY'S CLAIM WAS NEITHER UNPLEADED NOR BASED SOLELY ON PAVECON'S FAILURE TO ISSUE STOCK AFTER THE REORGANIZATION

As an initial matter, Pavecon's appellate arguments rely on re-characterizations of the record and the nature of Mr. Murphy's claims unsupported by the record. Pavecon asserts that, leading up to the trial, Mr. Murphy's claims rested solely on a theory that Pavecon owed him compensation as a partner in the Pavecon entities. It asserts that Mr. Murphy's "experts based their opinions and

conclusion about the value of Murphy's damages on the theory that he was a member/partner, and then based their valuations of Murphy's damages on his purported ownership of the 'capital accounts' Pavecon Ltd. and Public Works maintained for members/partners." But shortly before trial, Pavecon asserts, Mr. Murphy shifted his entire theory of the case to an unpleaded claim based solely on Pavecon's failure to acquire additional shares of Pavecon Holding stock for his benefit after the reorganization. These assertions are inaccurate.

Mr. Murphy consistently maintained, beginning with his original petition, that Pavecon breached his employment agreement by failing to pay him his equity bonuses as promised. In later petitions, Mr. Murphy alleged alternative theories of liability. In his live pleading at the time of the trial,[2] Mr. Murphy alleged that:

> Murphy and Defendants entered into a contract regarding Murphy's employment, including without limitation the Employment Agreement . . . . Defendants failed to comply with the agreements by, among other things, failing to fully and completely pay Murphy pursuant to the terms of the agreement. Plaintiff fully performed his portion of the agreement by working as agreed. After the reorganization in 2015, the Defendants failed to pay the Equity Bonus, and intentionally did not issue the stock as done in previous years without notice of their intent to do so. These failures and refusals to pay the Equity Bonus . . . were a material breach and caused Plaintiff's damages in the amount of the value of Murphy's percentage of equity/capital account for the years at issue, 2015, 2016 and 2017 in the Pavecon Ltd. Co. and Pavecon Public Works LP. The increase in the Murphy capital account is reflected on the partnership K-1 reports to

---

[2] The trial court struck Mr. Murphy's Fourth Amended Petition, so the Third Amended Petition was the live pleading. The trial court explained during the trial that it granted Pavecon's motion to strike the Fourth Amended Petition, not because it asserted a new theory of liability, as Pavecon asserts, but because the trial court thought the petition was both untimely and redundant of the claims already asserted in the Third Amended Petition.

the IRS as reported by Pavecon. This Equity Bonus is based upon the agreed percentages and can be calculated from the Pavecon financials.

Liberally construed, Mr. Murphy's petition alleged that Pavecon breached the employment agreement both by failing to pay the equity bonuses allocated to his capital accounts and, alternatively, by failing to provide stock in Pavecon Holding after the reorganization. *See Bos v. Smith*, 556 S.W.3d 293, 305–06 (Tex. 2018) ("When, as here, no special exception is made, we liberally construe the pleadings in the pleader's favor."); *see also Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 896 (Tex. 2000) (noting that a pleading need only provide fair and adequate notice of the facts underlying a claim such that an opposing party can ascertain the nature and basic issues of the controversy and what testimony will be relevant).

In the same petition, Mr. Murphy alleged additional alternative claims based on his status as a partner and member in the reorganized entities. Although Pavecon correctly notes that Mr. Murphy abandoned his partnership claim shortly before the trial,[3] his breach of contract claim, founded on the assertion that Pavecon breached the employment agreement by failing to provide him with either the cash value of his accumulated equity bonuses or the same value in Pavecon Holding stock, was neither new nor unpleaded.

---

[3] The trial court granted Pavecon partial summary judgment on the issue of whether Mr. Murphy was a partner or member in the reorganized entities.

We also reject Pavecon's assertion that Mr. Murphy's expert reports and damages calculations were based entirely on his claimed partnership interests—an assertion readily contradicted by reference to the reports. Indeed, Mr. Murphy's damages expert report specifically states:

> To the extent the Pavecon defendants now claim that Marty is not a "partner" because he did not sign the egregious Limited Partnership/Limited Liability documents[,] Marty should have been paid the cash amount set aside in his capital account balance under the Employment Agreement for the Stock Equity Bonus or given the stock he was promised for which the money was set aside.

Pavecon's assertion that Mr. Murphy adopted this breach of contract theory for the first time on the eve of trial is, at best, unfounded.

And despite Pavecon's repeated assertions to the contrary, Mr. Murphy's breach of contract claim at trial did not rely entirely on the theory that Pavecon breached the employment agreement by failing to take the balance of his capital accounts and use it to purchase shares of Pavecon Holding stock for his benefit. Consistent with the above-quoted portion of his expert's report, Mr. Murphy's theory of damages and liability at the trial was based on Pavecon's failure to either pay him the funds allocated in his capital accounts upon termination or purchase stock for his benefit. Mr. Murphy's counsel reiterated this during the trial, in response to the same arguments Pavecon now advances in this appeal:

> [W]hat we're saying is, for '15 and '16. They took that money, they allocated it into the K-1. They never took -- made any effort to buy Pavecon Holding stock. And we say that's a breach and that they -- and further they -- you know, he's allocated that as income under that stock

equity bonus plan. He paid the tax on it. They kept the money. And then when they terminated him, they didn't pay it to him -- they didn't pay it over to him either.

Mr. Murphy's damages expert's testimony supported a conclusion that Pavecon should have either issued stock or given Mr. Murphy the cash value accumulated in his capital account, and Mr. Murphy's counsel emphasized this alternative theory of breach during closing arguments:

Mr. Murphy is not asking for the compensation for anything about a partnership. What he's asking for compensation for is to be paid what was agreed to by Mr. Walker on the employment agreement.
And that amount is to flow through the -- from the employment agreement, multiplied by 20 percent times the bottom line profits that we've talked about, to come up with a number that goes into the capital account. That capital account amount is right here. That's the amount that should have been paid to Mr. Murphy for years of 2015, '16 and '17 . . . .

Thus, Mr. Murphy's breach of contract claim, as pleaded and tried, included a theory of liability based on Pavecon's failure to give Mr. Murphy the accumulated cash value of his equity bonuses when it terminated him in 2017.

### THE TRIAL COURT DID NOT ERR BY DENYING PAVECON'S MOTIONS SEEKING JUDGMENT AS A MATTER OF LAW

Pavecon contends the trial court erred by denying its motion for directed verdict and its post-judgment motions seeking to disregard the jury's verdict on Mr. Murphy's breach of contract claim. We review the denial of those motions as a challenge to the legal sufficiency of the evidence. *El-Rayes v. Lee*, No. 05-19-00881-CV, 2020 WL 7767939, at *2 (Tex. App.—Dallas Dec. 30, 2020, no pet.) (mem. op.);

*see also City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005) ("[T]he test for legal sufficiency should be the same for summary judgments, directed verdicts, judgments notwithstanding the verdict, and appellate no-evidence review.").

To successfully challenge the legal sufficiency of evidence supporting an adverse finding on an issue on which the appellant had the burden of proof at trial, the appellant must demonstrate that the evidence conclusively established all vital facts in support of the issue as a matter of law. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). Accordingly, the appellant must show both that there is no evidence supporting the jury's finding and that the evidence conclusively establishes the opposite finding. *Id.* If the appellant challenges the legal sufficiency of evidence supporting an adverse finding on an issue on which it did not have the burden of proof at the trial, the appellant must show only that there is no evidence to support the finding.

In determining evidentiary sufficiency, we view the evidence in the light most favorable to the finding, indulging every reasonable inference that would support it and disregarding all contrary evidence a reasonable juror could disregard. *City of Keller*, 168 S.W.3d at 821. If the evidence at trial would enable reasonable people to differ in their conclusions, a reviewing court may not substitute its judgment for the jury's. *Id.* at 822.

*The SPA's release clause does not bar Mr. Murphy's claim*

Pavecon's first sufficiency argument centers on the SPA's release clause, which states in relevant part:

> FOR THE PURPOSES AND CONSIDERATION SET FORTH HERERIN, THE SELLING STOCKHOLDER . . . DOES HEREBY WAIVE, RELEASE AND DISCHARGE THE COMPANY . . . OF AND FROM ANY AND ALL . . . CLAIMS, RIGHTS, DEMANDS, CAUSES OF ACTION AND SUITS IN EQUITY, OF ANY AND EVERY KIND OR CHARACTER, IN CONTRACT OR TORT, WHETHER KNOWN OR UNKNOWN, ARISING UNDER, RELATING TO OR IN CONNECTION WITH THE RELATIONSHIP OR DEALINGS BETWEEN THE COMPANY . . . AND THE SELLING STOCKHOLDER . . . UP TO AND THROUGH THE CLOSING DATE, INCLUDING, WITHOUT LIMITATION, CLAIMS FOR BREACH OF CONTRACT . . . SELLING STOCKHOLDER FURTHER AGREES NOT TO FILE A LAWSUIT TO ASSERT SUCH CLAIMS.

According to Pavecon, this broad release specifically prohibits Mr. Murphy from asserting any breach of contract claim based on unissued shares of Pavecon Holding stock.

Keeping in mind our previous observation that Mr. Murphy's claim was not limited to his assertion that Pavecon breached the employment agreement by failing to give him additional shares of Pavecon Holding stock, we construe this general, categorical release narrowly in light of the facts and circumstances surrounding its execution, in order to give effect to the parties' intent. *See Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931, 938 (Tex. 1991); *Tricentrol Oil Trading, Inc. v. Annesley*, 809 S.W.2d 218, 221 (Tex. 1991).

The SPA's release begins by specifically stating that the parties granted it "for the purposes and consideration set forth" elsewhere in the agreement. Those "purposes," according to the agreement, were to allow Pavecon Holding to repurchase Mr. Murphy's stock as "part of an overall plan for the Company to purchase all of the capital stock owned and held by minority shareholders who are employees of the Company or its affiliates."

Despite Pavecon's assertions to the contrary, the SPA does not directly prohibit Mr. Murphy from acquiring additional shares of Pavecon Holding stock in the future. Pavecon points to a number of provisions providing that, after the transaction, Mr. Murphy would no longer be a shareholder, would no longer have any rights as a shareholder, and would "have no future participation in any future [Pavecon Holding] gains, losses, profits or distributions with respect to the Common Stock" exchanged through the SPA. But these provisions do nothing more than state the obvious—if Mr. Murphy sold all of his shares, as the agreement required, then he would no longer be a shareholder or have any future rights with respect to those shares.

Pavecon also relies on another provision it pulls out of context: "[T]he Purchase Payment represents the final payment and distribution that the Company will make to the Selling Stockholder." That statement is found within a section of the SPA titled "TAX MATTERS," and it deals specifically with the tax implications of the SPA transaction. It does not address Mr. Murphy's ability to obtain additional

–16–

shares of Pavecon Holding stock in the future. And it is undisputed that "the Purchase Payment" was not, in fact, the "final payment and distribution" Pavecon made to Mr. Murphy—Pavecon continued to pay Mr. Murphy his salary, cash bonuses, and a portion of his equity bonuses after the December 2016 closing date. Thus, one cannot reasonably interpret this provision as expressing the parties' intention that Mr. Murphy would not receive future equity bonuses from Pavecon, whether paid in stock or otherwise.

Moreover, nothing in the SPA suggests that eliminating Pavecon's continuing obligation to provide equity bonuses under Mr. Murphy's employment agreement was a "purpose" for which the release was granted, and we conclude the release does not apply to Mr. Murphy's claim for unpaid equity bonuses following the reorganization.

* * *

But even if the release were not limited to the "purposes" for which it was granted, Pavecon would not be entitled to a rendered judgment. As the party with the trial burden of proving that Mr. Murphy released his claim, Pavecon must show that the evidence conclusively established the release's applicability. *Dow Chem. Co.*, 46 S.W.3d at 241. By its own terms, the release applies only to claims "UP TO AND THROUGH THE CLOSING DATE." Accordingly, Pavecon must point to evidence conclusively establishing that Mr. Murphy's claim accrued before the SPA's December 2016 closing date. Pavecon has not met that burden.

The employment agreement provides no explicit deadline by which Pavecon was required to transfer stock to Mr. Murphy. Moreover, both parties argued and presented evidence that the original employment agreement was modified in 2015. Although Mr. Murphy acknowledged only that the parties agreed to reduce his bonus percentages upon the hiring of Mr. Dumke, Pavecon asserted that the parties also agreed to modify their agreement to reflect that: (1) Mr. Murphy would no longer receive shares of Pavecon Holding Stock after the reorganization; and (2) Mr. Murphy would receive his equity bonuses, in the same percentages, in the form of "profit sharing" allocated to his capital accounts in the reorganized entities—but only if he signed the remainder of the reorganization agreements. The jury, however, was not bound by either party's theory of the facts.

Based on the evidence presented at trial, the jury could have agreed with Pavecon that the parties modified the employment agreement to reflect both that Mr. Murphy would no longer receive shares of Pavecon Holding stock after the 2015 reorganization and that Mr. Murphy's equity bonuses would instead be allocated to capital accounts in his name. The jury was not required to go along with Pavecon's assertion that Mr. Murphy had to sign the remainder of the reorganization agreements before he could receive those equity bonuses.

Mr. Murphy testified that no one from Pavecon ever told him he would have to sign the remaining reorganization agreements to continue receiving the equity bonuses promised under his original employment agreement. He further testified that

–18–

Mr. Walker and Mr. Heierman specifically told him the only agreement he had to sign was the SPA, and that Pavecon's lawyer told him the reorganization would not affect anything other than Mr. Walker's dilution. Pavecon did not present any evidence, much less conclusive evidence, showing that it notified Mr. Murphy he would no longer receive the equity bonuses promised under his employment agreement if he did not sign the remaining reorganization agreements.

More importantly, the evidence conclusively shows that Pavecon did not insist on Mr. Murphy signing the remaining reorganization agreements before: (1) allocating amounts to his capital accounts consistent with the agreed equity-bonus percentages; (2) representing in post-reorganization tax filings that Mr. Murphy had earned the amounts allocated to his capital accounts; and (3) paying Mr. Murphy a portion of those allocations in cash to cover taxes. The jury could have concluded neither party intended or understood that Mr. Murphy would forfeit his equity bonuses if he did not sign the remaining reorganization agreements.

In addition, Mr. Murphy's damages expert testified that a non-partner can own a capital account. And Mr. Walker testified that the reorganization was better for everyone because "[w]hat you got was what -- was yours in your account." Mr. Walker also testified that—although his lawyers did not want him to admit it—his understanding upon Mr. Murphy's termination was that Pavecon owed Mr. Murphy the balance of his capital accounts, despite the fact that he never signed the remaining reorganization agreements. The jury further heard evidence that other Pavecon

executives received the amounts allocated to their capital accounts when they left the company.

The evidence at trial thus sufficiently supports a conclusion that: (1) the parties modified the original employment agreement to allow Pavecon to compensate Mr. Murphy by allocating the agreed upon equity-bonus percentages to capital accounts in his name, rather than providing Pavecon Holding stock; (2) upon his termination, Pavecon owed Mr. Murphy the accumulated cash value of those unpaid equity bonuses; and (3) Pavecon breached the parties' agreement by failing to pay those balances upon his termination in May 2017.

Consequently—and in the alternative to our conclusion that the release does not apply to Mr. Murphy's claim for unpaid equity bonuses following the reorganization—the evidence supports a conclusion that Mr. Murphy's claim did not accrue until his termination in May 2017, which places it outside the scope of the release.

*Legally sufficient evidence supports the jury's damages award*

Citing *Willis v. Donnelly*, 199 S.W.3d 262, n.24 (Tex. 2006), and *Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, (Tex. 2020), Pavecon next argues that there is no legally sufficient evidence supporting the jury's finding on damages, because Mr. Murphy did not offer evidence of the fair-market market value of the Pavecon Holding stock he claims he should have received. Although the circumstances in *Willis* and *Pike* are quite different from those here, we need not determine whether

–20–

fair-market value provided the correct measure of damages for a claim based solely on unissued stock, because—as we noted above—Mr. Murphy's claim was not based solely on unissued stock, and the jury could have concluded Pavecon breached the parties' agreement by failing to pay Mr. Murphy the accumulated balance of his post-2014 equity bonuses.

The proper measure of damages for a claim based on that breach was the cash value of the accumulated equity bonuses Pavecon owed Mr. Murphy through his termination, as reflected in the balances of his capital accounts through 2016, plus the prorated portion of his 2017 equity bonuses. That is the amount Mr. Murphy's expert opined Pavecon should have paid under the employment agreement, the amount Mr. Murphy requested from the jury, and the amount the jury awarded.[4] The evidence sufficiently supports the jury's finding.

*Mr. Murphy did not have the burden of obtaining*
*a finding on conditions precedent*

Pavecon next contends we should render judgment in its favor because Mr. Murphy failed to obtain a finding on conditions precedent. "A condition precedent is an event that must happen or be performed before a right can accrue to enforce an obligation." *Solar Applications Eng'g, Inc. v. T.A. Operating Corp.*, 327 S.W.3d 104,

---

[4] The jury awarded Mr. Murphy the full amount of the balances allocated to his capital accounts through 2016, but it awarded him approximately $33,000 less than he sought for the prorated portion of his 2017 bonus. Although it is not apparent from the record exactly how the jury calculated the reduced 2017 award, we note that Mr. Murphy's expert calculated the bonuses based on Mr. Murphy having worked through May 2017, despite the record establishing his termination on May 9—a fact pointed out by Pavecon's counsel during cross examination.

108–09 (Tex. 2010). "A party seeking to recover under a contract bears the burden of proving that all conditions precedent have been satisfied." *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 283 (Tex. 1998).

According to Pavecon, Mr. Murphy could not participate in the profit-sharing plans outlined in the reorganization agreements until he signed those agreements. From that premise, Pavecon argues that, because Mr. Murphy never signed the remaining reorganization agreements, he failed to satisfy a condition precedent to his ability to recover the balance of his capital accounts established under the profit-sharing plans. Pavecon further argues that Mr. Murphy's failure to obtain a jury finding on that issue is fatal to his judgment. *See Enter. Prod. Partners, L.P. v. Energy Transfer Partners, L.P.*, 529 S.W.3d 531, 541 (Tex. App.—Dallas 2017), *aff'd*, 593 S.W.3d 732 (Tex. 2020).

The obvious flaw in Pavecon's argument is that Mr. Murphy did not sue for breach of the unsigned profit-sharing agreements; he sued for breach of his employment agreement, which imposes no reorganization-based conditions on his right to continue receiving equity bonuses. Pavecon asserts that the parties modified the original employment agreement to require that Mr. Murphy sign the reorganization agreements before he could continue receiving his equity bonuses after the reorganization. But as the party asserting modification as a defense to Mr. Murphy's claims, Pavecon had the burden of pleading and proving both that the parties modified the employment agreement to impose the signature requirement as

a condition precedent and that Mr. Murphy's failure to sign the reorganization agreements excused its nonperformance. *See Hathaway v. General Mills, Inc.*, 711 S.W.2d 227, 228–29 (Tex. 1986); *Metrocon Const. Co., Inc. v. Gregory Const. Co., Inc.*, 663 S.W.2d 460, 464–65 (Tex. App.—Dallas 1983, writ ref'd n.r.e.). Pavecon cannot shift the burden to Mr. Murphy to obtain a finding negating its affirmative defense. *See Metrocon Const. Co., Inc.*, 663 S.W.2d at 465.

Additionally, even if signing the remaining reorganization agreements had been a condition precedent to Mr. Murphy's ability to continue earning equity bonuses after 2014, Mr. Murphy's failure to obtain a jury finding on that issue would not be fatal to the judgment, because the evidence conclusively establishes that Pavecon waived any such condition precedent. *See* TEX. R. CIV. P. 279; *Enterprise Products Partners, L.P.*, 529 S.W.3d at 541–43. "Waiver is the intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right." *Enterprise Products Partners, L.P.*, 529 S.W.3d at 543. Evidence is conclusive if reasonable people could not differ in their conclusions. *See id.* (citing *City of Keller*, 168 S.W.3d at 816).

As we have said, the evidence shows that, despite knowing Mr. Murphy did not sign the remaining reorganization agreements, Pavecon: (1) allocated the amount of his equity bonuses to his capital accounts in 2015 and 2016; (2) filed tax statements, under the penalty of perjury, representing that Mr. Murphy received the full amount of those equity bonuses; and (3) paid Mr. Murphy a portion of those

bonuses in cash to cover his tax liability. In addition, Mr. Walker candidly admitted that, at the time of Mr. Murphy's termination, he thought Pavecon owed Mr. Murphy the balance of his capital accounts. Under these facts, there is one reasonable conclusion—Pavecon acted intentionally in a manner inconsistent with claiming the right to require Mr. Murphy to sign the remaining reorganization agreements before allowing him to receive equity bonuses after 2014.

*Pavecon did not establish its modification defense*

Pavecon next argues the evidence conclusively establishes its modification defense. Contract modification is an affirmative defense, and the party asserting it bears the burden of proof. *Intec Sys., Inc. v. Lowrey*, 230 S.W.3d 913, 918 (Tex. App.—Dallas 2007, no pet.). Whether the parties have modified an employment contract "depends on the parties' intentions and is a question of fact." *Hathaway*, 711 S.W.2d at 228–29.

In employment-at-will situations, either party may impose modified terms as a condition of continued employment. *Id.* But the party asserting the modification must prove that the other party agreed to the modified terms. *Id.* Generally, when an employer notifies an employee of changed employment terms, the employee must either accept the new terms or quit. *Id.* If the employee continues working with knowledge of the changes, the employee accepts those changes as a matter of law. *Id.* Thus, proof of modification requires: (1) notice of the change; and (2) acceptance of the change. *Id.*

To prove notice, an employer asserting a modification must prove that it provided unequivocal notice of definite changes in employment terms. *Id.* And fairness dictates that the employee must know both the nature of the changes and the certainty of their imposition. *Id.*

Pavecon contends it gave Mr. Murphy unequivocal notice that its equity-compensation scheme would change after the reorganization. Thus, Pavecon argues, by continuing to work for Pavecon after the reorganization, Mr. Murphy accepted the changes outlined in the reorganization agreements, including the signature requirement, as a matter of law. In essence, Pavecon argues that Mr. Murphy is bound by the changes to the equity-bonus structure outlined by the reorganization agreements, despite the fact that he never signed those agreements, while simultaneously arguing that Pavecon is not bound to perform its obligations under those agreements, because Mr. Murphy never signed them.[5] We join the trial court and jury in disagreeing with Pavecon.

As an initial matter, Pavecon did not conclusively prove it gave Mr. Murphy unequivocal notice that he would no longer receive equity bonuses after the reorganization unless and until he signed the remaining reorganization agreements. In fact, the evidence conclusively proves the opposite. Pavecon paid Mr. Murphy a

---

[5] Notably, Pavecon quotes a supreme court opinion for the proposition that Mr. Murphy cannot accept the benefits of the SPA while disclaiming his obligations under that agreement. *See Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools*, 246 S.W.3d 42, 74 (Tex. 2008) ("A contracting party cannot accept the benefits of a contract and disclaim its obligations.").

portion of the equity bonuses he earned after the reorganization, despite knowing that he did not sign the reorganization agreements. Mr. Murphy testified that no one from Pavecon ever told him he would have to sign the remaining reorganization agreements to continue receiving his equity bonuses. And he testified that both Mr. Walker and Mr. Heierman specifically told him the SPA was the only he agreement he had to sign. Mr. Walker admitted he told Mr. Murphy the terms of the reorganization agreements were subject to further negotiation—which means the terms outlined in those agreements would not be imposed with certainty. And Mr. Walker admitted to his belief upon Mr. Murphy's termination that Pavecon owed Mr. Murphy the balance of his capital accounts, despite knowing that Mr. Murphy never signed the reorganization agreements.

There is no evidence from which a reasonable juror could conclude Mr. Murphy received unequivocal notice that the changes outlined in the unsigned reorganization agreements—and specifically any requirement that Mr. Murphy must sign those agreements before participating in post-reorganization equity bonuses— would be imposed with certainty. *See id.* Pavecon's modification defense fails as a matter of law.

*Pavecon is not entitled to a rendered judgment*
*on its own breach of contract claim*

Pavecon next argues that "[b]y filing this lawsuit to assert released claims, Murphy breached the Covenant Not to Sue contained within the [SPA's release

–26–

clause] as a matter of law." It thus contends we should render judgment in its favor on its own breach of contract claim against Mr. Murphy and award its attorneys' fees. Given our conclusion that the SPA did not release Mr. Murphy's claims, we reject Pavecon's arguments on this issue.

THE TRIAL COURT DID NOT COMMIT REVERSIBLE ERROR IN CHARGING THE JURY

Next, Pavecon asserts that, to the extent it is not entitled to a rendered judgment, we should reverse and remand for a new trial based on jury charge errors. Trial courts have broad discretion in formulating jury charges, and we review allegations of charge error for abuse of discretion. *See Hinojosa v. LaFredo*, No. 05-18-01543-CV, 2021 WL 2217165, at *5 (Tex. App.—Dallas June 2, 2021, pet. denied) (mem. op.). In determining whether a charge error has occurred, we consider the pleadings, the evidence presented at trial, and the charge in its entirety. *Id.* We will not reverse for charge error unless the error likely either caused the rendition of an improper judgment or prevented the appellant from properly presenting the case on appeal. TEX. R. APP. P. 44.1(a).

To preserve charge error, "the objecting party must present a complaint to the trial court that distinctly designates the error and grounds for the objection." *Hinojosa*, 2021 WL 2217165, at *5 (citing TEX. R. APP. P. 33.1(a)(a); TEX. R. CIV. P. 272, 274). Any complaint about an instruction that is not specifically included in the objection is waived. *Id.* And if the objection at trial is not the same as the complaint on appeal, the issue has not been preserved for our review. *Id.*

Pavecon first asserts that questions one and two in the charge were erroneous because they neglected to include controlling fact questions. Question one asked: "Did Marty Murphy and any of the [Pavecon] Defendants agree, among other things, that Marty Murphy was entitled to be compensated for his employment?" Question two asked: "Did any of the [Pavecon] Defendants fail to comply with the agreement, if any, regarding Marty Murphy's compensation?"

Pavecon argues these questions were inadequate because they did not include any factual details about the parties' dispute. According to Pavecon, the issue is not whether the parties agreed that Mr. Murphy would be compensated for his employment; rather, the issue is whether he was entitled to receive a particular form of compensation after the reorganization. At the charge conference, however, Pavecon did not specify which disputed terms it believed required inclusion. Instead, it directed the trial court to its proposed questions one and two, which sought to limit and reframe Mr. Murphy's claim by asking: (1) whether any of the Pavecon defendants agreed that Pavecon Public Works and Pavecon Ltd. would take allocations made to capital accounts and use them to purchase stock in Pavecon Holding on Mr. Murphy's behalf; and (2) whether any of the Pavecon entities failed to comply with such an agreement.

As we have discussed above, Mr. Murphy's claim was not limited to whether Pavecon breached the agreement by failing to procure Pavecon Holding stock for his benefit after 2015. Although Mr. Murphy testified to his understanding that

–28–

Pavecon would use the money allocated to his capital accounts to purchase stock for his benefit, his legal claim—as pleaded, tried, and argued to the jury—was that Pavecon breached his employment agreement by failing to pay his equity bonuses either by giving him shares of Pavecon Holding in an amount equivalent to the percentages outlined in his employment agreement or by paying him the cash value of his outstanding equity bonuses upon his termination.

Pavecon's requested questions seeking to limit and reframe Mr. Murphy's claim to one based solely on stock were not substantially correct, and the trial court did not abuse its discretion by refusing them. *See Hinojosa*, 2021 WL 2217165, at *5 (citing TEX. R. APP. P. 33.1(a)(a); TEX. R. CIV. P. 272, 274); TEX. R. CIV. P. 278. Although questions one and two could have been worded better to capture the essential dispute between the parties, we discern no preserved error that likely resulted in an improper judgment or prevented Pavecon from presenting its appeal. *See* TEX. R. APP. P. 44.1(a).

Pavecon also argues the trial court reversibly erred by omitting Pavecon's proposed instruction on conditions precedent. As discussed above, there were no conditions precedent to Mr. Murphy's ability to recover under his original employment agreement—the agreement underlying his breach of contract claim at the trial. Pavecon's proposed instruction, which attempted to shift the burden to Mr. Murphy to negate its modification defense, would have been improper. *See* TEX. R. CIV. P. 278. Moreover, because we have concluded that Pavecon waived the

purported condition precedent as a matter of law, any error in failing to give that instruction would not have been reversible in any event. *See* TEX. R. APP. P. 44.1(a).

Pavecon next argues it is entitled to a new trial because the charge, which asked the jury to determine the cash amount that would fairly compensate Mr. Murphy for Pavecon's failure to comply with the parties' agreement with respect to his compensation, did not instruct the jury on any measure of damages. *See* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Business, Consumer, Insurance, Employment* PJC 115.3 ("PJC 115.3 may not be submitted without an instruction on the appropriate measures of damages." (citing *Jackson v. Fontaine's Clinics, Inc.*, 499 S.W.2d 87, 90 (Tex. 1973))). But this argument does not match Pavecon's objection at the charge conference. Pavecon did not object that the question lacked *any* instruction on the measure of Mr. Murphy's damages; rather, Pavecon objected to the lack of an instruction specifically limiting the measure of Mr. Murphy's damages to the fair-market value of any Pavecon Holding stock he should have received. Because Mr. Murphy's claim was not limited to Pavecon's failure to issue stock, Pavecon's requested instruction was incomplete and would not have been substantially correct. *See* TEX. R. CIV. P. 278.

\*     \*     \*

Even assuming both that Pavecon preserved this issue and that the trial court erred by failing to give the jury guidance on the appropriate measure of damages, we are not convinced the trial court's error caused an improper judgment. Mr.

–30–

Murphy presented only one claim to the jury, and he urged only one measure of damages for that claim—the cash value of his unpaid equity bonuses, as partially reflected by Pavecon's allocations to his capital accounts in 2015 and 2016. His damages expert testified to that measure of damages and performed calculations based upon it. And it is clear from the record that the jury based its award on that measure of damages.

As discussed above, this was the proper measure of damages to the extent the jury found that Pavecon breached the parties' modified employment agreement by terminating Mr. Murphy without paying the accumulated balance of his post-2014 equity bonuses. This case is unlike those Pavecon cites where the trial court's failure to include an instruction on the proper measure of damages was harmful error. *Compare Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 817 (Tex. 1997) (harmful: plaintiff tried multiple claims, its principal claim had multiple measures of damages, and plaintiff failed to establish the portion of its losses attributable to the defendant's actions); *and Jackson*, 499 S.W.2d at 90 (harmful: plaintiff tried multiple claims, and the jury was asked to determine the plaintiff's "loss of monetary reward," which apparently referred to lost profits, without giving the jury any guidance on how to determine lost profits); *with Borkert v. Tworek*, No. 04-16–00529-CV, 2018 WL 842981, at *5 (Tex. App.—San Antonio Feb. 14, 2018, no pet.) (mem. op.) (harmless: there was a single measure of damages urged for a

single breach of contract claim, the evidence supported that measure, and the jury awarded the amount plaintiff testified was owing under the parties' agreement).

Finally, Pavecon argues the trial court reversibly erred by refusing Pavecon's requested questions on its affirmative defenses of release, modification, estoppel, and waiver. A trial court must give an instruction on a controlling issue raised by the pleadings if it is supported by legally sufficient evidence. TEX. R. CIV. P. 278.

With respect to release and modification, we have already determined those defenses failed as a matter of law—the release does not apply to Mr. Murphy's claims for unpaid equity bonuses following the reorganization, and there is no evidence from which the jury could conclude Mr. Murphy received unequivocal notice that he would have to sign the remaining reorganization agreements before he could continue receiving his equity bonuses. Thus, the trial court did not reversibly err by omitting Pavecon's proposed questions on those defenses.

With respect to equitable estoppel, Pavecon argues that the evidence shows Pavecon would have fired Mr. Murphy as early as June 2015, if it had "known about his clandestine operation at his property." But to establish equitable estoppel as an affirmative defense, Pavecon had to present legally sufficient evidence on each of the following elements: (1) Mr. Murphy made a false representation or concealment of material facts; (2) Mr. Murphy had knowledge of those facts; (3) Mr. Murphy intended that Pavecon would act upon those facts; (4) Pavecon lacked both knowledge of the facts and the means of obtaining such knowledge; and (5) Pavecon

detrimentally relied on Mr. Murphy's misrepresentation or concealment. *See Wyde v. Francesconi*, 566 S.W.3d 890, 897 (Tex. App.—Dallas 2018, no pet.).

There is no evidence from which the jury could conclude that Pavecon lacked the means to uncover Mr. Murphy's actions with respect to his property. Numerous Pavecon employees participated in the work on Mr. Murphy's property, there was testimony suggesting the work was discussed at multiple company meetings, and Pavecon had the ability to determine whether a job number was established in its system to track work done on Mr. Murphy's property. The fact that Mr. Walker testified that he was not previously aware of those facts is no evidence that Pavecon lacked the means of obtaining such knowledge. The trial court did not abuse its discretion by denying Pavecon's requested question on estoppel.

With respect to waiver, Pavecon argues that the executed SPA alone was legally sufficient evidence to support a finding that Mr. Murphy waived his claim to any future allocations of Pavecon Holding stock. As discussed above, however, the SPA did not directly limit Mr. Murphy's ability to obtain shares of Pavecon Holding stock in the future, and it certainly did not foreclose Mr. Murphy's ability to continue earning equity bonuses after the reorganization. No reasonable juror could conclude from this evidence that Mr. Murphy waived his claim to continue receiving equity bonuses after the reorganization. The trial court did not reversibly err by refusing to submit Pavecon's requested question on waiver.

Having overruled each of Pavecon's issues, we affirm the trial court's judgment.

/Cory L. Carlyle/
CORY L. CARLYLE
JUSTICE

200438f.p05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

PAVECON HOLDING CO. INC., PAVECON LTD. CO., AND PAVECON PUBLIC WORKS, LP, Appellant

No. 05-20-00438-CV        V.

MARTY MURPHY, Appellee

On Appeal from the 192nd Judicial District Court, Dallas County, Texas Trial Court Cause No. DC-17-10592. Opinion delivered by Justice Carlyle. Justices Myers and Partida-Kipness participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee MARTY MURPHY recover his costs of this appeal and the full amount of the trial court's judgment from appellants PAVECON HOLDING CO. INC., PAVECON LTD. CO., AND PAVECON PUBLIC WORKS, LP, and from WESTERN SURETY COMPANY as surety on appellants' supersedeas bond.

Judgment entered this 6th day of May, 2022.